Present:  All the Justices

TAMEIKA WILLIAMS, ADMINISTRATOR
AND PERSONAL REPRESENTATIVE OF
THE ESTATE OF TAWANDA WILLIAMS, DECEASED

v.  Record No. 071409        OPINION BY JUSTICE DONALD W. LEMONS
                                      June 6, 2008
CONG LE, M.D.

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Jonathan C. Thacher, Judge

In this appeal, we consider whether the trial court erred in instructing the jury on superseding intervening causation in a medical malpractice case.

I.    Facts and Proceedings Below

On May 26, 2005, Tawanda Williams ("Williams") saw Dr. Daniel G. Kaw ("Dr. Kaw"), a physician at the Fair Oaks Kaiser Permanente Center in Fairfax, for pain in her right calf and leg.  Dr. Kaw ordered a Doppler ultrasound to be performed on Williams' calf within the Kaiser system in mid-June.  Williams scheduled a follow-up appointment for "June 6 or PRN" ("as needed").

On June 1, 2005, Williams returned to the Fair Oaks Kaiser Permanente Center to see Dr. Paul McClain ("Dr. McClain"), her primary care physician.  Williams complained of ankle pain and discomfort in her calf.  Williams told Dr. McClain that she had "misstepped a few weeks earlier."  Dr. McClain thought Williams had a possible tear in the back of

her calf muscle.  Dr. McClain ordered an ankle x-ray for June 1, 2005, and rescheduled the Doppler ultrasound of her calf to be performed within 48 hours.

Williams went to Tysons Corner Diagnostic Imaging for a Doppler ultrasound appointment on June 2, 2005.  Megan Murphy ("Murphy"), a sonogram technician, performed the Doppler ultrasound on Williams.  Murphy called Dr. Cong Van Le ("Dr. Le"), a diagnostic radiologist who was working at Vienna Diagnostic Imaging,[1] and sent him the image of Williams' right lower leg by electronic mail.  Murphy believed that the images showed that Williams had a deep vein thrombosis in her right lower leg.  Murphy told Dr. Le that she had informed Williams that there was a "positive finding," and that she should see her doctor as soon as possible.

Upon reviewing the images of Williams' leg, Dr. Le diagnosed Williams with deep vein thrombosis in her right leg.[2] The presence of deep vein thrombosis put Williams at risk for pulmonary embolism, a life-threatening condition in which pieces of a deep vein clot break off and slip out of the vasculature of the legs and travel into the lungs.

---

[1] Tysons Corner Diagnostic Imaging and Vienna Diagnostic Imaging are separate facilities that are part of the same corporation, Diagnostic Imaging Associates.

[2] Specifically, Dr. Le diagnosed Williams with two deep vein blood clots in the popliteal vein and the posterior tibial vein, and one blood clot in a superficial vein, the lesser saphenous vein.

Dr. Le telephoned Dr. McClain's office to tell Dr. McClain the diagnosis of Williams' condition. Dr. Le reached an automatic telephone system, followed the instructions, and then reached an operator. He told the operator who he was, that he was a radiologist, and asked to speak to Dr. McClain. The operator told Dr. Le she would have to locate Dr. McClain, and then she put Dr. Le "on hold." Dr. Le was "on hold" long enough that he "lost [his] confidence to get in touch with [Dr. McClain] at that moment." He stated that he was unable to leave a voicemail or talk to a human being. Dr. Le testified that previously he had problems communicating with the doctors at Kaiser by telephone. Dr. Le prepared a "wet read" (an emergency read) with his findings and drew a picture of Williams' lower extremity showing the location of the blood clots. He placed the wet read in a "wet read box" to be sent immediately by facsimile to Dr. McClain.

After the Doppler ultrasound was performed, Williams telephoned Dr. McClain on June 2. She left a message for Dr. McClain advising him that she had been told by Murphy to call him. Dr. McClain did not personally receive Williams' message.

At 10:43 p.m. on June 2, 2005, Dr. McClain sent the following electronic mail message regarding Williams to his clinical assistant, Lynne Stidman ("Stidman"): "Lynne - Would

3

you get the results of the Doppler study of the leg from Tyson Corner Diagnostic Imaging Center. . . . Please place the result in a Pace note and message me. Thanks. Dr. McClain." "PACE" is Kaiser's electronic system for patient medical records and internal non-urgent messages. On the morning of June 3, 2005, Stidman called the imaging center and had the results of the Doppler study sent to her by facsimile. Stidman received the report and entered it into the PACE system. At 10:24 a.m. on June 3, 2005, Stidman sent the following message to Dr. McClain: "Patient's Doppler results are in the computer." Dr. McClain did not read Stidman's message until June 15, 2005, after Williams died.

Dr. McClain had an appointment scheduled with Williams on June 6, which Williams did not attend. Williams died on June 8, 2005, from a pulmonary embolism. Dr. McClain did not look at the results of the Doppler ultrasound of Williams' leg until February of 2006. Dr. McClain testified that normally, if there was a positive finding from a Doppler ultrasound, he would be notified by the radiologist with "direct contact," which was "[g]enerally voice-to-voice contact." Dr. McClain testified that had he received direct contact, he would have immediately started Williams on anticoagulant therapy. The plaintiff's expert testified that "anticoagulation would have prevented [Williams] from developing a pulmonary embolism,"

4

and that if the anticoagulant therapy had been started anytime before the morning of June 7, 2005, the treatment would likely have prevented Williams' death.

Tameika Williams ("Tameika"), as administrator and personal representative of the estate of Williams, filed a complaint against Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc., Mid-Atlantic Permanente Medical Group, P.C., Tyson's Corner Diagnostic Imaging, Inc., Vienna Diagnostic Imaging, Inc., and Dr. Le, alleging negligence in a wrongful death action. Tameika nonsuited her claims against Tysons Corner Diagnostic Imaging, Inc. and Vienna Diagnostic Imaging, Inc. Tameika settled her claims against Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc. and Mid-Atlantic Permanente Medical Group, P.C. The case proceeded to trial solely against Dr. Le.

At trial, Tameika presented expert testimony that the standard of care requires that a radiologist who diagnoses a patient with deep vein thrombosis make "direct communication with the physician who ordered the study or with one of their physicians who was covering or a nurse or the patient directly," so that the treating physician can "institute prompt treatment." At the conclusion of the evidence, over Tameika's objection, the trial judge gave the following instruction on superseding intervening causation:

5

A superseding cause is an independent event, not reasonably foreseeable, that completely breaks the connection between the Defendant's negligent act and the alleged injury or death. A superseding cause breaks the chain of events so that the Defendant's original negligent act is not a proximate cause of the Plaintiff's injury in the slightest degree.

On March 21, 2007, the jury returned a verdict for Dr. Le. The trial court entered a final order confirming the jury's verdict in favor of Dr. Le. Tameika appeals from the final order on one assignment of error: "In this medical malpractice case the trial court erred in instructing the jury on superseding intervening cause (Instruction N)."

## II. Analysis

"When asked to review jury instructions given by a trial court, 'our responsibility is to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises.' " Monahan v. Obici Med. Mgmt. Servs., 271 Va. 621, 636, 628 S.E.2d 330, 339 (2006) (quoting Lombard v. Rohrbaugh, 262 Va. 484, 498, 551 S.E.2d 349, 356 (2001)). "[A] litigant is entitled to jury instructions supporting his or her theory of the case if sufficient evidence is introduced to support that theory and if the instructions correctly state the law. The evidence introduced in support of a requested instruction must amount to more than a scintilla."

Holmes v. Levine, 273 Va. 150, 159, 639 S.E.2d 235, 239 (2007) (citations omitted).

Dr. Le argued two separate theories at trial to avoid liability. First, he argued that he was not liable because the standard of care did not require him to make direct contact with Dr. McClain, a member of Dr. McClain's team, or the patient herself. In furtherance of this theory, Dr. Le's expert testified that communication directly with a physician when reporting non-routine ultrasound results was not required, and that sending test results by facsimile was within the standard of care. Second, Dr. Le argued that even if he was negligent for not making direct contact with Dr. McClain, a member of Dr. McClain's team, or Williams, his negligence was not a proximate cause of Williams' death because Dr. McClain's subsequent negligence in failing to check the diagnostic report completely broke the chain of events between Dr. Le's negligence and Williams' death.

"The proximate cause of an event is that act or omission which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces the event, and without which that event would not have occurred." Beverly Enterprises-Virginia v. Nichols, 247 Va. 264, 269, 441 S.E.2d 1, 4 (quoting Coleman v. Blankenship Oil Corp., 221 Va. 124, 131, 267 S.E.2d 143, 147 (1980)). There may be more than one

7

proximate cause of an event.  Panousos v. Allen, 245 Va. 60, 65, 425 S.E.2d 496, 499 (1993).  A subsequent proximate cause may or may not relieve a defendant of liability for his negligence.  "In order to relieve a defendant of liability for his negligent act, the negligence intervening between the defendant's negligent act and the injury must so entirely supersede the operation of the defendant's negligence that it alone, without any contributing negligence by the defendant in the slightest degree, causes the injury."  Atkinson v. Scheer, 256 Va. 448, 454, 508 S.E.2d 68, 71 (1998) (quoting Jenkins v. Payne, 251 Va. 122, 128-29, 465 S.E.2d 795, 799 (1996)).

An instruction may be given if the evidence is sufficient to support the theory of the instruction.  Accordingly, in this case, such an instruction would be properly given only if reasonable persons could conclude from the evidence and reasonable inferences therefrom that Dr. McClain's later negligence alone, "without any contributing negligence by [Dr. Le] in the slightest degree, caused [Williams'] death."  Atkinson, 256 Va. at 454, 508 S.E.2d at 72; Panousos, 245 Va. at 65-66, 425 S.E.2d at 499.

On the question of causation, the evidence proved without contradiction that the communication problems in this case were begun and put in motion by Dr. Le's failure to make direct contact with Dr. McClain, a member of his team, or Williams.

"[A]n intervening cause does not operate to exempt a defendant from liability if that cause is put into operation by the defendant's wrongful act or omission." Jefferson Hosp., Inc. v. Van Lear, 186 Va. 74, 81, 41 S.E.2d 441, 444 (1947). On this record, it cannot be said that Dr. Le's alleged negligence was not contributing "in the slightest degree" to the death of Williams. The trial court therefore erred in granting the superseding intervening causation instruction. "[W]here . . . an instruction [has] been erroneously submitted to the jury and the record does not reflect whether such . . . instruction formed the basis of the jury's verdict, we must presume that the jury relied on such . . . instruction in making its decision." Monahan, 271 Va. at 635, 628 S.E.2d at 338 (quoting Johnson v. Raviotta, 264 Va. 27, 39, 563 S.E.2d 727, 735 (2002)).

### III. Conclusion

For the reasons stated, the judgment of the trial court will be reversed and the case remanded for a new trial.

Reversed and remanded.

9